UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-23046-CIV-COHN-SELTZER

PLEASANT VALLEY BIOFUELS, LLC,

    Plaintiff,

v.

SANCHEZ-MEDINA, GONZALEZ, QUESADA,
LAGE, CRESPO, GOMEZ & MACHADO, LLP,

    Defendant,

v.

QUEST CORPORATION, STEVEN
WORTON, and LUCAS FORD,

    Third-Party Defendants.

_____/

**SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, CRESPO, GOMEZ & MACHADO, LLP'S MOTION TO EXCLUDE THE EXPERT REPORT AND OPINIONS OF DONALD COKER**

Defendant Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado, LLP ("Defendant" or "SMGQ"), pursuant to Rules 104, 403, and 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), hereby respectfully moves this Court to exclude the expert opinions of Plaintiff, Pleasant Valley Biofuels, LLC's ("Plaintiff") expert, Donald Coker, on the following grounds: (1) Mr. Coker is not qualified to offer opinions regarding the standard of care of an escrow agent; and (2) Mr. Coker's opinions are not helpful to the trier of fact in that they are improperly based upon Mr. Coker's legal interpretation of the pertinent agreements in the case, are contrary to the evidence

1

established in this case, contain impermissible legal conclusions, and offer factual testimony in the form of a narrative.

## INTRODUCTION

Plaintiff's claims arise out of services rendered by SMGQ as an escrow agent in a loan transaction entered into by PV Biofuels and Quest Capital Finance Corporation ("Quest"). On September 1, 2011, SMGQ, Quest, and PV Biofuels executed an Escrow Agreement, pursuant to which SMGQ was to hold in escrow a $280,000 deposit (the "Deposit") from PV Biofuels and subsequently transfer that Deposit to Quest pursuant to the terms and conditions agreed upon by the parties. The purpose of the Deposit was for Quest to acquire a Standby Letter of Credit in order to obtain financing for PV Biofuels' requested loan. The Escrow Agreement required SMGQ to follow the instructions for release of the Deposit to be later provided to SMGQ in a mutually agreed upon Commitment Letter that would be executed by both by PV Biofuels and Quest. PV Biofuels and Quest executed the contemplated Commitment Letter on September 21, 2011, which set forth the terms and conditions of the loan transaction and gave further instructions regarding SMGQ's handling of the Deposit. On that day, a copy of the Commitment Letter was emailed to SGMQ by Quest, copying PV Biofuels.

The Commitment Letter specifically directed SMGQ to release the Deposit to Quest, per Quest's instructions. Accordingly, upon SMGQ's receipt of the executed Commitment Letter from the parties, SMGQ in good faith understood that directive in the Commitment Letter to be its authorization and requirement to release the Deposit. SMGQ subsequently disbursed the Deposit to Quest. Quest failed to close on the loan and has not returned the Deposit to PV Biofuels to date. PV Biofuels now claims that SMGQ was grossly negligent when it disbursed

the Deposit to Quest because such disbursement was contrary to SMGQ's duties outlined in the Escrow Agreement.

## LEGAL ARGUMENT

The expert opinions set forth by Mr. Coker must be excluded because: (1) Mr. Coker does not maintain the requisite qualifications based on his knowledge, skill, experience, training, or education to opine on whether SMGQ adhered to its duties as escrow agent or on the requisite standard of care of an escrow agent; and (2) Mr. Coker's expert opinions do not assist the trier of fact because the premise of his opinions is improperly based on his legal interpretation of the Escrow Agreement and Commitment Letter, his opinions contradict the indisputable facts established by the record, his opinions improperly offer legal conclusions regarding causation and SMGQ's adherence to a standard of care, and his expert report improperly asserts a factual narrative.

### I.   LEGAL STANDARD FOR THE ADMISSION OF EXPERT TESTIMONY

The admissibility of expert testimony is governed by Rule 702 of Federal Rules of Evidence, which provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1183 (11th Cir. 2013). To that end, the trial judge must find that *all* of the proffered expert testimony is "properly grounded, well-reasoned and not speculative before it can be admitted." Fed. R. Evid. 702, Adv. Comm. Notes (2000). Rule 702 requires that district courts act as gatekeepers and allow only

3

expert testimony that is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Stated differently, "the Federal Rules of Civil Procedure 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597). To fulfill the gatekeeper function imposed by Rule 702 and *Daubert*, courts must make a rigorous three part inquiry and determine whether,

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*HDR Eng'g, Inc.*, 731 F.3d at 1183; *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted) (citing *Daubert*, 509 U.S. at 589); *Valencia v. Sanborn Mfg. Co., Inc*, No. 04-21416-CIV, 2005 WL 5957819, *4 (S.D. Fla. Aug. 11, 2005). "[T]he burden of laying the proper foundation for the admission of expert testimony rests with its proponent." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005). Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough. *Id.* The party offering the expert must present the witness' proposed testimony in a form that persuades the trial court that the testimony will in fact assist the trier of fact. *Id.* "[C]arrying this burden requires more than the *ipse dixit* of the expert." *Id*

4

**II.     MR. COKER'S EXPERT OPINIONS AND REPORT SHOULD BE EXCLUDED BECAUSE MR. COKER IS NOT QUALIFIED TO OFFER OPINIONS REGARDING THE STANDARD OF CARE FOR AN ESCROW AGENT AND WHETHER SMGQ ADHERED TO THAT STANDARD**

Plaintiff has retained Mr. Coker to opine on the standard of care for an escrow agent and whether SMGQ adhered to that standard of care. Mr. Coker, however, is not qualified to serve as an expert witness and opine on such matters. An expert witness may be qualified to testify and give his or her opinions by way of his knowledge, skill, experience, training, or education. Fed. R. Evid. 702; *Georgian v. Zodiac Grp., Inc.*, No. 10-CIV-60037, 2011 WL 2530967, *2 (S.D. Fla. June 23, 2011). Determining whether an individual is qualified as an expert in the field in which he is offering an opinion is a "threshold determination" in deciding whether to admit expert evidence. *Medina v. United Christian Evangelistic Ass'n*, No. 08-22111-CIV, 2009 WL 4030454, *2 (S.D. Fla. Nov. 20, 2009). The expert must be qualified in a manner that relates to the opinion offered. *Id.* "[A]n expert, whether basing testimony upon professional studies or personal experience, [must] employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

Most significantly, Mr. Coker clearly has limited relevant experience, if any, serving as an escrow agent or working for an employer that routinely serves as an escrow agent. Mr. Coker's report outlines his qualifications in numbered paragraphs and yet not a single paragraph indicates that Mr. Coker has first-hand experience serving as an escrow agent. (Expert Report of Donald Coker ("Coker Report"), attached hereto as Exhibit A, pp. 1-3, ¶¶1-10). Additionally, there is nothing in Mr. Coker's report, which indicates he has received any formal training or education regarding the standard of care for escrow agents or on the practice of serving as an escrow agent. (*Id.*). Mr. Coker's report merely sets forth that his "education, training, work, and management background includes specific experience as *a lender* originating over 36,000 loans

5

that were *closed by escrow agents*." (*Id.* at p. 2, ¶4 (emphasis added)). The report furthers states that Mr. Coker is published in "many areas of finance including closing and escrow fraud." *Id.* Yet, Mr. Coker has not identified any of his publications, which are relevant to the applicable standard of care for an escrow agent.

The deposition of Mr. Coker further confirms his lack of qualifications as an expert in this case. Mr. Coker's *only* experience actually serving as an escrow agent was in his first job out of college, when he worked for First National Bank of Mobile, Alabama, from 1968 to 1972— *over forty years ago*. (Deposition Transcript of Donald Coker ("Coker Tr."), attached hereto as Exhibit B, 27:5- 31:8). Being his first job out of college there, Mr. Coker did not even have a title: "I didn't really have a title there. They don't give you titles when you're just one, two, three years out of college. . . . You're just 'Hey, you.'" (*Id.* at 29:3-10). During his employment with First National Bank, Mr. Coker worked in the Trust Department, managing investments in mortgages and performed job duties such as "handling other people's money," handling some of the bank's money because the bank would buy securities and investments and manage those in trust accounts, and handling money to manage investments in mortgages, securities, and equities. (*Id.* at 28:4-29:2). When asked if his duties involved dealing with escrow accounts, he specifically testified, "They did involve dealing with escrow accounts. In fact, in many cases we would actually . . . serve as the closing agent if we were making a mortgage loan. Oddly enough, it sounds strange today, but we would actually do that right there in the office." (*Id.* at 29:13-18). He further testified that when closing some of the loans "we would be acting as an escrow agent, but we would also be making the loan with our money, so we're doing the same thing as an escrow agent." (*Id.* at 29:21-24). That testimony encapsulates the totality of Mr. Coker's experience serving in an escrow agent like capacity. Mr. Coker's minimal experience serving in

6

an escrow agent capacity over forty years ago hardly qualifies him to opine at length about whether SMGQ operated within industry standards as an escrow agent.

Even more significant and beyond Mr. Coker's lack of experience, skill, and training, is Mr. Coker's testimony that about the time that he was leaving his first job at First National Bank, there was a "universal change" in the industry regarding escrow agent services because banks began using escrow agents that were parties separate from the bank itself. (*Id.* at 36:20-37:4). He even admitted that he did not serve as an escrow agent for the remainder of his career, which was after this "universal change." (*Id.* at 39:22-40:2). As such, Mr. Coker had no experience serving as an escrow agent or performing duties akin to those of an escrow agent after the industry-wide change in practice. Such a drastic change in the practice of escrow agents in the financial industry renders any minimal and insignificant experience Mr. Coker had serving in an escrow agent capacity, which was over forty years ago and prior to the change in practice, an unsuitable predicate for expert testimony. *See FNB Bank v. Park Nat. Corp.*, No. CIV.A. 13-0064-WS-C, 2014 WL 289184, *2 (S.D. Ala. Jan. 27, 2014). Accordingly, Mr. Coker is not qualified to set forth his opinions regarding the standard of care for an escrow agent or SMGQ's adherence to that standard and should be excluded from offering any such opinions in this case.

III.   **MR. COKER'S EXPERT OPINIONS DO NOT ASSIST THE TRIER OF FACT**

   **A. The Basis for Mr. Coker's Expert Opinion Regarding the Facts of this Case is His Legal Interpretation of the Escrow Agreement, Which Warrants Exclusion of His Opinions in Their Entirety**

The very basis of Donald Coker's expert opinions regarding SMGQ's conduct is his interpretation of SMGQ's duties as set forth in the contracts that governed the parties conduct, namely, the Escrow Agreement and the Commitment Letter. Expert testimony should be excluded where it simply reiterates a recasting of a party's interpretation of a contract. *FNB*

*Bank*, 2014 WL 289184 at *5. Moreover, it is well established that a legal conclusion is an improper subject for expert testimony. *Georgian v. Zodiac Grp., Inc.*, No. 10-CIV-60037, 2011 WL 2530967. *3 (S.D. Fla. June 23, 2011) (limiting expert's testimony regarding the agreements between the two parties and stating that "Mr. Zigel, however, may not testify to rote legal conclusions"); *see Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990) (An expert "cannot testify to the legal implications of conduct [because] the court must be the jury's only source of law."). Furthermore, "absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible." *In re Nationsrent Rental Fee Litigation*, No. 06-60924-CIV, 2009 WL 87607, *2 (S.D. Fla. 2009).

First, at his deposition, Mr. Coker testified that his opinions relate to *his interpretation* of the Commitment Letter and the Escrow Agreement in addition to his experience in "the industry," which, as established above, is minimal as it relates to the standard of care for escrow agents. (Coker Tr., 7:3-8:11). For example, based on his interpretation of the Escrow Agreement, regarding section 1.A. of the Escrow Agreement, Mr. Coker testified that SMGQ should have received documentary evidence or paperwork from the lender that the items in 1.A had been met. (*Id.* at 152:16-155:5; 161:8-162:11). Essentially, Mr. Coker is positing, as an expert, that he interprets section 1.A of the Escrow Agreement to mean that SMGQ needed to receive some sort of documentation from Quest evidencing that the conditions in that provision had been met, which is a clearly not a duty required of SMGQ on the face of the Escrow Agreement. (Escrow Agreement, attached hereto as Exhibit C).

Accordingly, based on Mr. Coker's interpretation of the terms of the Escrow Agreement regarding how SMGQ was to conduct itself as an escrow agent in this particular transaction, all of his opinions regarding SMGQ's conduct are improper because they are premised off of his

legal interpretation. Specifically, the opinions set forth in paragraphs 3, 5, 6, 9, and 10 are improper because Mr. Coker's basis for the alleged "breach" of standard of care is from his interpretation of the terms contained in section 1.A of the Escrow Agreement. (Coker Report, pp. 4-6, ¶¶ 3, 5, 6, 9, & 10). This is evidenced in paragraph six of Mr. Coker's expert report, which states, "Based on my experience . . . it is a flagrant violation of the applicable standard of care for an escrow agent to disburse funds without verifying that the terms of the escrow agreement. . . . It is my opinion that Sanchez-Medina did not conform to that duty in how they handled this transaction between Pleasant Valley Biofuel and Quest." (*Id.* at p.5, ¶6).

Such a legal interpretation and positing of what the Escrow Agreement requires warrants exclusion of Mr. Coker's expert opinions. *See FNB Bank*, 2014 WL 289184 at *5. Just as the Eleventh Circuit in *Montomgery v. Aetna Casualty & Surety Co.* prohibited an expert from offering an opinion about the scope of an insurer's duty under an insurance policy based on the expert's legal interpretation of the policy, here, Mr. Coker should not be permitted to opine on the duties of SMGQ and SMGQ's exercise of care based on his legal interpretation of the Escrow Agreement. *See Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *FNB Bank*, 2014 WL 289184 at *5; *see also Maiz v. Virani*, 253 F.3d 641, 668 n.19 (11th Cir. 2001) (the *Montgomery* Court "ruled that the district court should not have allowed an expert to state his opinion regarding the duties created by an insurance contract," while the expert in *Maiz*, in contrast, "did not purport to tell the jury how it should interpret the contracts").

### B. Mr. Coker's Opinion That the Loan Transaction Entered Between PV Biofuels And Quest Was One-Sided in Favor of Quest Must be Excluded Because the Indisputable Record Facts Contradict or Otherwise Render his Opinion Unreasonable and Unhelpful to the Trier of Fact

Mr. Coker improperly offers an opinion characterizing the loan terms for the loan transaction entered between Quest and PV Biofuels as "highly suspect," "high irregular," and

9

"one-sided." (Coker Report, pp. 5-6, ¶8). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *See Solheim Farms, Inc. v CNH America, LLC*, 503 F. Supp. 2d 1146, 1149 (D. Minn. 2007); *see also Greenwell v. Boatwright*, 184 F.3d 492, 495 (6th Cir. 1999) ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence."); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426(WHP)(HBP), 2012 WL 466785, *3, 16–17 (S.D.N.Y. Feb. 14, 2012) (precluding the defendant's expert from offering an opinion that was contrary to the defendant's own documents).

In paragraph four of Mr. Coker's expert report, he outlines a laundry list of terms contained in the Commitment Letter, characterizes the terms as one-sided, and asserts that SMGQ should have "recognized" those terms as being suspect. (Coker Report pp. 5-6, ¶8). Mr. Coker's expert opinion contradicts the undisputed facts established in the record. Specifically, Steven Worton, President and CEO of PV Biofuels and also PV Biofuels' 30(b)(6) witness—and an individual with approximately ten (10) to fifteen (15) years of experience in the financial lending business and who had been involved in dozens of commercial loans—testified that upon the company's receipt of the Escrow Agreement from Quest, he reviewed it, discussed the agreement with all of the members of PV Biofuels, and sent the agreement to Anthony Sasser, legal counsel for PV Biofuels, to obtain a legal opinion on the terms contained therein. (Deposition Transcript of Steven Worton ("Worton Tr."), attached hereto as Ex. D, pp. 57:23-58:18; 18:20-23; 184:18-25). Steven Worton further testified that PV Biofuels did not request that SMGQ make any changes to the Escrow Agreement and that he, personally, was satisfied with the Escrow Agreement. (*Id.* at 59:24-60:3). Regarding the Commitment Letter, Mr. Worton similarly testified that upon receipt of the Commitment Letter, he discussed it with the members

of PV Biofuels, including Jonathan Adamson and Andrew Mortenson; that PV Biofuels had conferences with Quest to receive clarification about some of the conditions in the Commitment Letter; that PV Biofuels consulted legal counsel about the Commitment Letter; and that PV Biofuels had made no requests for any changes to be made to the terms contained in the Commitment Letter. (*Id.* at 63:1-66:10).

In addition, Jonathan Adamson, one of the co-owners of PV Biofuels and members of its board, further testified to the same effect. Regarding the Escrow Agreement Mr. Adamson testified that it was in the best interests of PV Biofuels to use the Escrow Agreement and that no one at PV Biofuels objected to the terms of the Escrow Agreement. (Deposition Transcript of Jonathan Adamson ("Adamson Tr."), attached hereto as Exhibit E, 116:25-118:12). As to the Commitment Letter, he testified that PV Biofuels was satisfied that the terms of the Commitment Letter were reasonable, that no one at PV Biofuels objected to the terms of the Commitment Letter, and that legal counsel reviewed the Commitment Letter prior to it being executed by PV Biofuels. (*Id.* at 115:14-118:8).

Lastly, Logan Kinghorn, former employee of PV Biofuels who was employed by PV Biofuels at the time it entered into the loan transaction with Quest and assisted with the arrangements of the subject loan transaction, testified that at the time the Commitment Letter was issued, he thought the terms of the Commitment Letter were reasonable, that the transaction and its terms were in the best interests of PV Biofuels, and that PV Biofuels consulted legal counsel regarding the terms and conditions of the Commitment Letter. (Deposition Transcript of Logan Kinghorn ("Kinghorn Tr."), attached hereto as Exhibit F, 65:9-66:3). Regarding the Escrow Agreement, Mr. Kinghorn testified that at the time the Escrow Agreement was executed, the board of PV Biofuels believed that the *transaction* was in the best interests of PV Biofuels,

that the Escrow Agreement was in the best interests of PV Biofuels, that PV Biofuels was sufficiently protected by the terms of the Escrow Agreement, that the agreement's terms were reasonable, and that PV Biofuels' legal counsel was consulted about its terms. (*Id.* at 71:22-72:19).

Furthermore, the Commitment Letter itself demonstrates that PV Biofuels obtained legal counsel to represent or assist it in its loan transaction with Quest and specifically review the terms and conditions of the Commitment Letter. (Commitment Letter, attached hereto as Exhibit G, pp. 5, 7, 9, 16).

It is clear that the undisputed facts contained in the record, specifically the Commitment Letter and the testimony of the current members and former employee of PV Biofuels, establish that the transaction and terms of the Escrow Agreement and Commitment Letter were reasonable and thought to be in the best interests of PV Biofuels. Moreover, Mr. Coker even testified himself that he it was "unclear" and was confusing to him what exactly was to happen in the loan transaction between Quest and PV Biofuels. (Coker Tr. 79:5-87:12). Without Mr. Coker having an understanding of how the transaction was supposed to work between Quest and PV Biofuels and in light of the undisputed facts that PV Biofuels took significant action to vet the terms of the Escrow Agreement and the Commitment Letter Mr. Coker's opinions regarding the nature of the transaction and the loan terms, specifically that they were "highly suspect," "high irregular," and "one-sided," must be excluded. The opinion is not supported by sufficient facts to validate it in the eyes of the law and since the indisputable record facts contradict or otherwise render his opinion unreasonable. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (U.S. 1993).

### C. Mr. Coker's Opinions Improperly Assert Legal Conclusions on Causation and SMGQ's Breach of the Standard of Care

To be sure, Mr. Coker was *not* retained to opine on causation or liability, but nonetheless includes in his report a conclusory, gratuitous sentence on causation, thereby requiring Defendant to address this issue, in which Mr. Coker improperly offers legal conclusions as opinions in his expert report regarding SMGQ's alleged failure to adhere to the standard of care for an escrow agent and causation.

As stated above, an expert may not testify to the legal implications of conduct; the court must be the jury's only source of law. *Falic v. Legg Mason Wood Walker, Inc.*, No. 03-80377-CIV, 2005 WL 5955704, *4 (S.D. Fla. Jan. 10, 2005); *see Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). As to Mr. Coker's opinion on causation, in paragraph eleven of Mr. Coker's report, he impermissibly states that in his opinion, SMGQ's handling of the escrow arrangement is the proximate cause of PV Biofuels losses and economic damages. (Coker Report, p. 6, ¶11). First, Mr. Coker was not retained as an expert on causation or liability, but rather was retained by PV Biofuels to testify as to SMGQ's duties as an escrow agent and the requisite standard of care. Second, Mr. Coker's opinion is an impermissible legal conclusion that is not helpful to the trier of fact because it is unsupported by any facts, which support a claim for damages and Mr. Coker's report fails to identify any facts reviewed by him evidencing any damages incurred by PV Biofuels. *See Falic*, 2005 WL 5955704 at *4 (finding that the expert's opinion that certain statements were not the proximate cause of a litigation amounted to a legal conclusion that could not be admitted at trial).

Furthermore, Mr. Coker makes improper and unsupported legal conclusions in his opinion in his report regarding SMGQ's adherence to a standard of care, one which Mr. Coker himself does not appear to fully comprehend. Paragraph nine of Mr. Coker's expert report asserts

13

that SMGQ "failed to observe good faith, fair dealing, ordinary care, honesty in fact, and reasonable commercial standards." (Coker Report, p. 6, ¶9). Regarding his use of the terms "good faith, fair dealing ordinary care, honesty in fact, and reasonable commercial standards," Mr. Coker testified that "those are legal terms [he] has heard used describing what is supposed to happen in this type of thing. . . . So, you know, there may be some differences among the definitions of those various items in there, but to me it's all just kind of lumped together as a layman." (Coker Tr., 136:5-17). He further testified that he has seen those terms used in legal documents, and when asked whether he had a specific understanding of the difference between each term he stated, "Well, I think I could probably differentiate between some of these. Sure." (*Id.* at 136:25-7). Lastly, when asked if he used his opinions in paragraph ten as a layman, he responded, "Yes." (*Id.* at 139:13-17). Paragraph nine of Mr. Coker's expert report is not only offering a legal conclusion as to SMGQ's conduct using terms that Mr. Coker does not fully comprehend, but also, it cannot constitute as an expert opinion because Mr. Coker admits that he simply lumped the terms together and used them as a layman. Accordingly, Mr. Coker's opinion in paragraph nine is improper, not helpful to the jury, and should be excluded.

### D. Mr. Coker's Opinion Is Improperly Used As A Vehicle For Factual Narrative Regarding The Terms Of The Commitment Letter

Finally, Mr. Coker improperly asserts a factual narrative in his expert report regarding some of the terms of the Commitment Letter. It is inappropriate for experts to become a vehicle for factual narrative. *See In re Trasyol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337 (S.D. Fla. 2010); *Island Intellectual Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008). "Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable

methodology." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013). "Mere narration thus fails to fulfill *Daubert's* most basic requirements." *Id.* In addition, narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion. *Id.* In *In re Trasyol Products Liability Litigation*, 709 F. Supp. 2d 1323, 1337 (S.D. Fla. 2010), the court found that the majority of the expert's opinions fell outside the proper scope of expert testimony because they consisted of a narrative of "selected regulatory events" and a summary of documents that the expert failed to tie to the opinions she intended them to support. *Id.* Similar to the expert in that case, in paragraph eight of his expert report, Mr. Coker lists an incomplete selection of terms from the Commitment Letter in order to paint a picture that the loan transaction entered into between Quest and PV Biofuels was so one-sided that it should have caused SMGQ to refuse to accept the terms of the Escrow Agreement or proceed with the transaction with caution. (Coker Report, pp. 5-6, ¶8). Mr. Coker's deliberate attempt to take select terms out of the Commitment Letter and highlight them as being one-sided is simply a mischaracterization of the loan transaction, the terms of the transaction, and its relevancy to SMGQ's duties as an escrow agent. This sort of impermissible factual narrative cannot be permitted as it invades on the province of the jury, does not provide the jury with helpful information, and takes the terms of the Commitment letter out of context from the agreement they originate from. Accordingly, Mr. Coker's factual narrative and opinions based thereon regarding the one-sided nature of the loan transaction and its relationship to how SMGQ should have governed itself as an escrow agent should be excluded.

## **CONCLUSION**

Because Mr. Coker is not qualified to opine on the standard of care of an escrow agent and whether SMGQ adhered to that standard and offers opinions which are not helpful to the

trier of fact, SMGQ respectfully requests this Court exclude the expert report and opinions of Mr. Coker.

Dated: April 30, 2014.                              Respectfully submitted,

                                                    s/ Rachel A. Lyons
                                                    Onier Llopiz (FBN 579475)
                                                    ol@lydeckerdiaz.com
                                                    Joan Carlos Wizel (FBN 37903)
                                                    jcw@lydeckerdiaz.com
                                                    Rachel A. Lyons (FBN 105347)
                                                    rlyons@lydeckerdiaz.com
                                                    LYDECKER│DIAZ
                                                    1221 Brickell Avenue, 19th Floor
                                                    Miami, Florida 33131
                                                    Telephone: (305) 416-3180
                                                    Facsimile:  (305) 416-3190

                                                    *Attorneys for Sanchez-Medina, Gonzalez,
                                                    Quesada, Lage, Crespo, Gomez & Machado LLP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 30, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. I also certify that a true and correct copy of the foregoing was served this day via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

                                                    s/ Rachel A. Lyons
                                                    Rachel A. Lyons (FBN 105347)

## SERVICE LIST

Jonathan Pollard
Jonathan Pollard, LLC
401 E. Las Olas Blvd. #1400
Fort Lauderdale, FL 33301
jpollard@pollardllc.com
*Attorney for Plaintiff Pleasant Valley Biofuels, LLC and Third-Party Defendant Steven Worton*