UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-23046-CIV-COHN/SELTZER

PLEASANT VALLEY BIOFUELS, LLC,

    Plaintiff,

v.

SANCHEZ-MEDINA, GONZALEZ,
QUESADA, LAGE, CRESPO, GOMEZ &
MACHADO LLP,

    Defendant,

v.

QUEST CORPORATION, STEVEN
WORTON, and LUCAS FORD,

    Third-Party Defendants.
_____/

**ORDER GRANTING MOTION TO EXCLUDE EXPERT REPORT AND
OPINIONS OF DONALD COKER AND DENYING MOTION TO
EXCLUDE EXPERT REPORT AND OPINIONS OF SHERI F. SCHULTZ**

**THIS CAUSE** is before the Court upon the Motion to Exclude the Expert Report and Opinions of Donald Coker [DE 47] and Motion to Exclude the Expert Report and Opinions of Sheri F. Schultz [DE 57] of Defendant Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado LLP ("SMGQ"). The Court has reviewed the Motions, the responses and replies thereto, and the record in this case, and is otherwise advised in the premises. For the reasons discussed more fully herein, the Court will grant the Motion to Exclude the Expert Report and Opinions of Donald Coker, and will deny the Motion to Exclude the Expert Report and Opinions of Sheri F. Schultz.

**I.  BACKGROUND**

This action arises out of a failed loan transaction between Plaintiff Pleasant Valley Biofuels, LLC ("Pleasant Valley") and Third-Party Defendant Quest Corporation ("Quest"). In 2011, Pleasant Valley, which specializes in the production of biofuels, desired to expand its business into renewable diesel. Pleasant Valley sought financing (the "Loan") from Quest for this endeavor. DE 50 ¶ 4. Pleasant Valley and Quest used SMGQ as escrow agent to hold a $280,000 deposit (the "Deposit") paid by Pleasant Valley in connection with the transaction. DE 1 ¶¶ 11–12. The Loan failed to close, however, and Pleasant Valley demanded that SMGQ return the Deposit. Id. at 2. Unfortunately, SMGQ had already disbursed the Deposit to Quest. Id. Pleasant Valley thus commenced this suit against SMGQ upon what it contends was a wrongful disbursement of the Deposit. Id. at 9.

To prove its claims and damages against SMGQ, Pleasant Valley has retained two expert witnesses: Donald Coker and Sheri F. Schultz. Pleasant Valley retained Coker to provide opinions relating to the duties of an escrow agent, and whether SMGQ breached those duties in its dealings with Pleasant Valley. See DE 47-1. Pleasant Valley retained Schultz to opine as to the amount of profits it would have earned had the $280,000 Deposit been available to it as working capital. See DE 44. SMGQ has responded with the Motions at issue in this Order, raising multiple arguments for the exclusion of each expert's testimony.

II.  **LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702.[1] In applying Rule 702, "district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)). "District courts are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Id. (internal quotation marks omitted). To meet this obligation, courts "must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." Id. at 1291–92 (internal quotation marks omitted). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Id. at 1292.

---

[1] Under Rule 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

To satisfy Daubert's first element, an expert may qualify to testify in multiple ways. Though some experts qualify on the basis of specialized training or education, the advisory committee notes to Rule 702 also contemplate that a witness may qualify as an expert "relying solely or primarily on experience." Fed. R. Evid. 702, advisory committee's note on 2000 amendment. "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." Feliciano v. City of Miami Beach, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks omitted).

For the second element, the courts have developed nonexclusive factors to aid in determining the reliability of an expert's methodology: "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." Rink, 400 F.3d at 1292. "Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). "A trial judge has considerable leeway in deciding how to determine when a particular expert's testimony is reliable . . . ." Coconut Key Homeowners Ass'n v. Lexington Ins. Co., 649 F. Supp. 2d 1363, 1371 (S.D. Fla. 2009) (internal quotation marks omitted).

Under the third element, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (en banc). Expert testimony does not help the

4

factfinder, however, if it offers "nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262–63. An expert's testimony also may be unhelpful where it poses too great a risk of confusion. Id. at 1263.

While Daubert mandates an "exacting analysis of the proffered expert's methodology, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Tech. DC-8, Inc., 326 F.3d at 1341 (citation & internal quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

Even if proposed expert testimony is admissible under Rule 702, that evidence may be excluded if it is irrelevant or if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; accord Allison v. McGhan Med. Corp., 184 F.3d 1300, 1309–10 (11th Cir. 1999). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." Frazier, 387 F.3d at 1263.

## III. DISCUSSION

### A. SMGQ's Motion to Exclude the Expert Report and Opinions of Donald Coker [DE 47]

Pleasant Valley retained Donald Coker to opine on an escrow agent's duty of care and whether SMGQ breached the applicable duty. Pleasant Valley seeks to qualify Coker as an expert based on his extensive banking experience. Coker boasts an impressive resume, having achieved remarkable success over the course of a lengthy

career. Nevertheless, the Court finds that Coker's experience does not qualify him as an expert witness regarding the contours of an escrow agent's responsibilities, and how SMGQ was required to conduct itself as escrow agent during the transaction at issue in this case. Accordingly, the Court will grant SMGQ's request to exclude Coker's opinions.

As previously noted, a witness may qualify as an expert "relying solely or primarily on experience." Fed. R. Evid. 702, advisory committee's note on 2000 amendment. However, "that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." Frazier, 387 F.3d at 1261. The witness must show "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. (internal quotation marks omitted). Here, despite Coker's professional success, his experience is insufficiently related to the subject of his opinions, and does not provide a sufficient basis for those opinions to qualify him as an expert.

Coker graduated from the University of Alabama with a B.A. in 1968, having majored in political science with a minor in finance. DE 47-1 at 32; DE 54-1 at 61:18–21. From 1968 to 1972, Coker worked in a low-level position for the First National Bank of Mobile, Alabama, mostly in its trust department. DE 54-1 at 27:9–30:6. In that role, Coker would sometimes perform the duties of an escrow agent. Id. at 29:19–24.

In 1972, however, Coker's banking career began to take off. He moved between multiple financial institutions into more senior positions of increasing responsibility. By the late 1980's, Coker had attained an executive position and directorship with a bank in Houston, where he was involved in originating and servicing loans. Id. at 31:8–45:10.

Coker took part in many transactions involving the use of an escrow agent after his departure from First National Bank in 1972 (DE 47-1 at 2), but his role in the overwhelming bulk of those transactions did not involve escrow-agent duties. DE 54-1 at 32:1–47:1. Though Coker did work for banks acting as escrow agents for their own transactions in the mid-1980's, he appears to have only a hazy recollection of the specifics of those escrow agreements and their purpose. See id. at 46:5–47:1. Coker's resume thus reflects little direct involvement with the details of an escrow agent's role and responsibilities since 1972. Nor does Coker have any significant training or education on the topic.[2]

Despite Coker's dated and sparse experience relating to an escrow agent's duties, he offers 11 discrete opinions on the subject in his expert report. DE 47-1 at 4–6. Coker's opinions contain detailed and forceful assertions of an escrow agent's legal and professional duties. Id. Coker discusses the conflicts between these purported legal duties and the terms of the agreements among Pleasant Valley, Quest, and SMGQ. Id. Coker opines as to how SMGQ should have conducted itself in the context of an escrow agent's professional duty of care as he understands it, and according to the agreements among the parties. Id. at 4–6. Coker determines that SMGQ breached a variety of legal and professional duties in acting as escrow agent. Id. at 6. Coker concludes that SMGQ's breaches "proximately caused" economic harms to Pleasant Valley. Id.

---

[2] The Court notes that Coker has apparently been engaged by a handful of clients as an expert witness or to render opinions regarding escrow agents during his second career as a financial and litigation consultant. DE 54-1 at 12:23–15:25, 56:7–18, 57:10–59:16. The Court does not view the fact of these engagements as appreciably impacting Coker's qualifications as an expert witness in this case, particularly given that at his deposition, Coker seemed to have difficulty recalling the substance of his work for those clients. See id. at 57:10–59:16.

7

The Court finds that Coker's limited experience relating to the duties of an escrow agent does not qualify him to express these opinions. Coker has not himself performed the duties of an escrow agent since 1972. Nor does Coker have significant formal training or education on the matter. Though Coker has been involved with numerous loan transactions for which an escrow agent's services were used—including instances where his own bank acted as escrow agent—the Court does not view this involvement as enabling Coker to testify regarding the details of an escrow agent's role or obligations. Coker's hazy recollections of the escrow arrangements for transactions he has been involved with since 1972 (see DE 54-1 at 46:18–23) emphasize that, whatever his experience with escrow agents may have been, it did not stick with him in the form of special expertise. Similarly, Coker admitted during his deposition that he did not understand the precise meaning of the terms he used to describe SMGQ's alleged breaches of its duties, and that he was simply repeating language that he had heard over the course of his career. Id. at 136:5–14.[3]

The Court thus concludes that while Coker's time in banking may have given him a general impression of the role of an escrow agent, it has not endowed him with a sufficient body of specialized knowledge to assist the trier of fact in understanding the

---

[3] Coker specifically testified regarding his opinion that SMGQ "failed to observe good faith, fair dealing, ordinary care, honesty in fact, and reasonable commercial standards" (DE 47-1 at 6) that:

> [T]hose are legal terms that I have heard used describing what is supposed to happen in this type of thing . . . . So, you know, there may be some differences among the definitions of those various items in there, but to me it's all just kind of lumped together as a layman. I kind of lump all that together and, you know, did they do what they were supposed to do?

DE 54-1 at 136:9–14.

8

evidence or issues of this case relating to the precise contours of SMGQ's duties as escrow agent or its performance of those duties. Because Coker's experience bears an inadequate relationship to the subject of his opinions, it does not qualify him as an expert witness on the matter, and his testimony is properly excluded. See MDS (Can.), Inc. v. Rad Source Techs., Inc., 822 F. Supp. 2d 1263, 1319–20 (S.D. Fla. 2011) (finding expert unqualified where education and background had inadequate relationship to subject of proposed testimony), aff'd in part & question certified, 720 F.3d 833 (11th Cir. 2013) (per curiam).

Even were the Court to find Coker qualified to testify, however, many of his opinions would be inadmissible for additional and independent reasons. For example, as discussed supra, note 3, Coker expressed his opinions using various legal terms of art. DE 47-1 at 4–6. At his deposition, however, Coker testified that he did not clearly understand the meanings of some of those legal terms. DE 54-1 at 136:11–14. Instead, Coker used the terms because "those are the legal terms that I have heard used describing what is supposed to happen in this type of thing." Id. at 136:9–11. Coker's use of legal terminology that he does not fully comprehend to convey his general impressions regarding SMGQ's conduct, combined with the additional heft jurors give to the testimony of expert witnesses, presents a real potential to mislead or confuse. Because this danger of confusion outweighs the probative value of such evidence, it is properly excluded under Federal Rule of Evidence 403. See Allison, 184 F.3d at 1309–10.

Coker also offers opinions as to the legal duty an escrow agent owes the parties to a transaction See DE 47-1 at 4–6. An expert witness may not testify as to the state of

9

the law, however; this is the Court's duty. Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). Coker's legal opinions, for example that "an escrow agent has a fiduciary duty to all parties to the escrow agreement" (DE 47-1 at 4), thus are inadmissible.

In conclusion, though Coker has amassed substantial professional success in banking, his experience is insufficiently related to an escrow agent's obligations to qualify him as an expert on SMGQ's duties as escrow agent in this case, or whether SMGQ breached those duties. Moreover, his proposed testimony contains other flaws that impact its reliability and admissibility while increasing the likelihood of confusing the jury. The Court therefore will grant SMGQ's motion to exclude Coker's expert report and opinions.

### B. SMGQ's Motion to Exclude the Expert Report and Opinions of Sheri F. Schultz [DE 57]

Pleasant Valley has also retained Sheri F. Schultz, with the firm of Fiske & Co., to render an expert opinion on the amount of profits Pleasant Valley lost as a result of SMGQ's allegedly wrongful disbursement of the Deposit. In her expert report, Schultz has concluded that "Pleasant Valley's lost profits from [SMGQ] releasing the escrow deposit to Quest are $1,848,000." DE 44 at 12.[4] SMGQ challenges the admissibility of this opinion by arguing that Schultz is unqualified and that her opinion is based on unfounded assumptions. The Court agrees with SMGQ that some of the assumptions underlying Schultz's opinion call her ultimate conclusions into question. Nevertheless, these attacks on the foundations of Schultz's opinion go to the weight, not the

---

[4] The Court notes that Pleasant Valley offers this evidence of extensive lost profits notwithstanding that the economic damages it seeks in its Complaint appear limited to the amount of the Deposit. See DE 1 at 9.

10

admissibility, of her testimony. Because Schultz is qualified to offer her opinion on lost profits, her methods are sufficiently reliable, and her testimony will assist the factfinder, the Court will deny SMGQ's request to exclude her opinions and testimony.

SMGQ first argues that Schultz is unqualified to testify to the amount of Pleasant Valley's lost profits because she knows too little about the basics of biofuel and regulation of the biofuel industry. DE 57 at 8–9. Schultz's opinion, however, goes more broadly to an estimation of Pleasant Valley's economic damages arising from SMGQ's allegedly wrongful release of the Deposit. See DE 44 at 4, 12. Schultz, a C.P.A. with certifications in business valuations and financial forensics, has significant accounting expertise and experience in the calculation of economic damages in litigation. Id. at 27–29. The Court thus finds Schultz qualified to opine on the topic of Pleasant Valley's economic damages, including the issue of lost profits, notwithstanding a lack of specific expertise in biofuels. See Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001) (economic damages expert qualified to testify on damages in real-estate industry despite lack of specific real-estate experience). Further, to the extent Schultz's opinion relies upon assumptions regarding the biofuels industry, SMGQ is free to challenge those assumptions at trial. See id. (objection to industry-specific assumptions underlying damages calculation goes "more to the foundation for [the expert] testimony than it does to [the expert's] qualifications").

SMGQ next challenges Schultz's testimony as unreliable. SMGQ argues principally that the assumptions underlying Schultz's opinions are flawed in ways that call the accuracy of the opinions into question. See DE 57 at 14–17. "Reliability" under Daubert, however, goes more to an expert's methodology than the correctness of

11

underlying assumptions. See Quiet Tech. DC-8, Inc., 326 F.3d at 1345–46. Therefore, SMGQ's argument that the data underlying Schultz's opinions is faulty or untrustworthy does not speak directly to its reliability. Here, Schultz has conducted what appears to be a relatively straightforward financial analysis of Pleasant Valley's projected profits based upon Pleasant Valley's historical performance, the anticipated capacity of Pleasant Valley's facilities, and market demand. Though Schultz relied upon estimates and projections to supply some of the underlying values for her analysis due to the lack of historical data, this does not render her opinions the sort of unsupported, contrived *ipse dixit* that should be excluded as unreliable. See Se. Metals Mfg. Co. v. Fla. Metal Prods., Inc., 778 F. Supp. 2d 1341, 1345 (M.D. Fla. 2011) (contrasting assumptions supporting admissible testimony with unfounded speculation).

For example, SMGQ objects to Schultz's reliance upon estimates of Pleasant Valley's future production. In conducting her analysis, Schultz has drawn her numbers for the capacity of Pleasant Valley's biofuel plant from an engineering report dated May 2011. See DE 44 at 5; DE 57-1 at 181:5–10. However, a major fire destroyed much of the plant and its equipment in June 2011. DE 44 at 5. Pleasant Valley rebuilt the plant, but SMGQ argues that data regarding the plant's pre-fire capacity has no bearing on its present capacity, and that the plant's pre-fire capacity is too thin a reed with which to support an estimate of future production. Though the Court agrees with SMGQ that the relationship between the pre-fire and post-fire capacity of the plant calls Schultz's estimates into question, this criticism goes to the weight of her conclusions, and does not render her opinion so speculative and unsupported as to require exclusion. See Se. Metals Mfg. Co., 778 F. Supp. 2d at 1345.

Schultz also relies upon Pleasant Valley's own estimates of its ability to ramp up production to 70% of capacity by the end of 2012, and to sell whatever biofuels it produced. See DE 44 at 10, 12; DE 57-1 at 150:18–151:16. Though Schultz's reliance upon Pleasant Valley's own projections again provides fodder for cross-examination, a damages expert's reliance upon data provided by the parties generally does not require exclusion of the resulting opinions. See Advanced Bodycare Solutions, LLC v. Thione, Int'l, Inc., 615 F.3d 1352, 1363–64 (11th Cir. 2010) (criticisms of economic damages expert's reliance upon unverified projections provided by party went to weight of evidence, not admissibility).

In sum, SMGQ's objections to the data underlying Schultz's opinions are well-taken. However, these weaknesses in Schultz's opinions are properly explored on cross-examination or through the presentation of contrary evidence. See Advanced Bodycare Solutions, LLC, 615 F.3d at 1363–64; Platypus Wear, Inc. v. Clarke Modet & Co., No. 06-20976, 2008 U.S. Dist. LEXIS 85140 at *12 (S.D. Fla. Oct. 6, 2008) ("Unless an expert's testimony is 'so fundamentally unreliable that it can offer no assistance to the jury, . . . the factual basis of the testimony goes to the weight of the evidence." (quoting Larson v. Kempker, 414 F.3d 936, 940–41 (8th Cir. 2005)). The Court therefore will not exclude Schultz's opinions or testimony as unreliable.

In a related argument, SMGQ contends that Schultz's methodology is unreliable because she does not use the common "before-and-after" or "yardstick" methods of calculating lost profits, having instead combined historical data with industry projections and client information to arrive at her own analysis of Pleasant Valley's lost profits. A plaintiff seeking lost profits under Florida law must "prove that the lost profits were a

direct result of the defendant's actions and that the amount of the lost profits can be established with reasonable certainty." River Bridge Corp. v. Am. Somax Ventures, 18 So. 3d 648, 650 (Fla. 4th DCA 2009) (quoting Forest's Mens Shop v. Schmidt, 536 So. 2d 334, 336 (Fla. 4th DCA 1988)).[5] Once causation is proved, however, "lost profit damages are recoverable if there is 'some standard by which the amount of damages may be adequately determined.'" Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1217 (11th Cir. 2006) (quoting W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348, 1350–51 (Fla. 1989)). Though the before-and-after and yardstick methods are frequently used to establish the amount of lost profits, these methods are not an absolute prerequisite to recovery, and lost profits can be had as long as there is some reasonable standard of calculation. See Marshall Auto Painting & Collision, Inc. v. Westco Eng'g, Inc., No. 02-109, 2003 U.S. Dist. LEXIS 27553 at *21–24 (M.D. Fla. May 8, 2003). The Court has already determined that Schultz's testimony regarding the amount of lost profits, though not immune from attack, is sufficiently reliable to be presented to the jury; her decision not to use the before-and-after or yardstick methods does not provide an independent and sufficient reason to exclude her testimony. The Court does not determine at this time, however, whether the evidence as presented at trial may ultimately suffice to establish the amount of Pleasant Valley's lost profits under Florida law. The Court notes that the issue of causation also remains an open question, which Pleasant Valley presumably intends to address with evidence beyond Schultz's testimony.

---

[5] Pleasant Valley and SMGQ appear to agree that Florida law governs Pleasant Valley's claims. See DE 57 at 5; DE 67 at 9.

Finally, the Court finds that Schultz's proposed testimony satisfies <u>Daubert's</u> third prong. Her estimate of profits derived from a biofuels plant concerns matters beyond the understanding of the average lay person, and would assist the trier of fact in understanding the evidence and issues of the case. See <u>Frazier</u>, 387 F.3d at 1262.

Because Schultz is qualified to testify as to the amount of Pleasant Valley's economic losses, and her opinions are sufficiently reliable and helpful to be presented to the jury, the Court will deny SMGQ's motion to exclude her report, opinions, and testimony. SMGQ, however, is free to challenge the factual bases of Schultz's testimony on cross-examination.

## IV. <u>CONCLUSION</u>

It is accordingly **ORDERED AND ADJDUGED** that SMGQ's Motion to Exclude the Expert Report and Opinions of Donald Coker [DE 47] is **GRANTED**. It is further

**ORDERED AND ADJUDGED** that SMGQ's Motion to Exclude the Expert Report and Opinions of Sheri F. Schultz [DE 57] is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 23rd day of June, 2014.

*/s/ James I. Cohn*
JAMES I. COHN
United States District Judge

Copies provided to:
Counsel of record via CM/ECF